UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                                                 :
KYLE PANZARELLA,                                                 :
                                                                 :
                               Plaintiff,                        :  **MEMORANDUM**
                                                                 :  **DECISION AND ORDER**
              - against -                                        :
                                                                 :  15 Civ. 2118 (BMC)
                                                                 :
H&L TOWING, INC., and H&L                                        :
CONTRACTING, LLC                                                 :
                                                                 :
                               Defendants.                       :
                                                                 :
---------------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff was injured while working as a deckhand, employed by defendant H&L Contracting, LLC ("HLC"), on the Manhasset Bay tug (the "Tug"). The exact circumstances that led to the accident are in dispute, but as a result, plaintiff lost an eye. Defendant H&L Towing, Inc. ("HLT"), an affiliate of HLC, is the owner of the Tug.

Plaintiff has asserted a claim of unseaworthiness against HLC and HLT, as well as a claim for negligence under the Jones Act against his employer, HLC. However, an unseaworthiness claim cannot be asserted against both parties; it can only be asserted against either the legal owner of a vessel, or the owner *pro hac vice*, that is, an entity which has acquired, usually by the terms of a charter party, such complete, albeit temporary, control of the vessel that is deemed the owner with respect to the injury in question.

Defendant HLC has moved for summary judgment on plaintiff's unseaworthiness claim. Having considered the terms of the charter party between HLT and HLC and the way it was

actually applied between them, I hold that that HLC was not an owner *pro hac vice*. Its summary judgment motion, dismissing the unseaworthiness claim, is therefore granted.

## BACKGROUND

HLC is a marine construction contractor which had roughly 40 employees at the time of plaintiff's accident. Keith Haney is an owner and Managing Director of HLC. He is also the president and owner of HLT. HLT was formed in 2009 and it purchased the Tug later that year. HLT has no employees and does not independently bid on projects.

In 2013, HLT's accountant recommended to Haney that he arrange for a formal agreement between the companies to account for payments to HLT from HLC when HLC used the Tug. Haney asked Peter Hough, a trusted adviser, to draft an agreement. Haney did not give Hough specific instructions about the type of agreement he wanted. Hough drafted a one-page charter agreement in about twenty minutes; Hough and Haney never discussed the agreement again. Haney signed the agreement as President of HLT; his brother, Chris Haney, signed it as President of HLC.

The document says that the purpose of the agreement is to "establish[] an hourly bareboat charter." The charter agreement was to last for two years beginning in January 2014. Under the terms of the charter agreement, HLC agreed to be responsible for all labor, fuel, maintenance, repairs, taxes, berth, and the safety of the vessel. Both entities agreed to be responsible for their own insurance. HLT was responsible for normal "wear and tear." Finally, HLC agreed to pay HLT $96.00/per hour for any time that it was using the Tug.

At his deposition, Haney testified, apparently as a matter of opinion, that the charter agreement did not prevent HLT from allowing other entities to charter the Tug when HLC was not using it.

In the months following the creation of the charter agreement, HLC did not use the Tug. In July 2014, HLT paid for repairs to the Tug. However, HLC completed routine maintenance on the Tug when it was using it for specific projects. HLC used the Tug for two projects in 2014 and was charged by the hour by HLT for its use of the Tug. HLC provided the crew for the Tug during these projects.

During the term of the charter agreement, HLT maintained liability insurance for the Tug and up to three crew members. HLT also paid the Tug's mortgage and the U.S. Coast Guard inspection fees during the term of the agreement. HLC, although it had a marine property and liability policy, did not list the Tug as a vessel under the policy.

## DISCUSSION

An owner of a vessel is generally liable for an injury suffered by a seaman as the result of the unseaworthiness of the vessel. See Reed v. S.S. Yaka, 373 U.S. 410, 83 S. Ct. 1349 (1963). The only way that an owner can avoid this liability is to prove that it "completely and exclusively relinquish[ed] possession, command, and navigation" of the vessel to an owner *pro hac vice* (literally, "on this occasion"). Guzman v. Pichirilo, 369 U.S. 698, 699, 82 S. Ct. 1095 (1962). A true bareboat charter agreement can establish the necessary transfer of control to make the charterer the owner *pro hac vice*. See Stolthaven Houston, Inc. v. Rachel B., No. 08 Civ. 4327, 2008 WL 2854278 (S.D.N.Y. July 18, 2008). "It is true that the law of admiralty has long recognized that in some situations a charterer of a vessel will be treated as the owner and called the owner *pro hac vice*." Fitzgerald v. A.L. Burbank & Co., 451 F.2d 670, 676 (2d Cir. 1971) (citing Reed v. S.S. Yaka, 373 U.S. 410 (1963)). "While the transfer of responsibility to the charterer for any costs and expenses can be a tell tale sign of a bareboat charter, 'the question whether the possession and control is transferred to the charterer must be determined by the

3

intention of the parties as expressed by the wording of the contract as a whole.'" Stolthaven, 2008 WL 2854278, at *5 (quoting Zabriskie v. City of New York, 160 F. 235, 237 (S.D.N.Y. 1908)).

A *pro hac vice* relationship can be established by actions that demonstrate possession and control have been transferred. If an owner seeks to show that it "completely and exclusively relinquished possession, command, and navigation" of the vessel, it "must bear the heavy burden of establishing facts which prove his point." Fitzgerald, 451 F.2d at 676. If the owner is responsible for keeping the vessel in good condition or if it supplies the crew, it is extremely unlikely that the owner has ceded control. Id.

To create a bareboat charter, "the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to the demisee . . . . It is therefore tantamount to, though just short of, an outright transfer of ownership. However, anything short of such complete transfer is a time or voyage charter party or not a charter party at all." Guzman, 369 U.S. at 699. In Reed v. S.S. Yaka, 373 U.S. 410, 83 S. Ct. 1349 (1963), the Supreme Court outlined the features of a bareboat charter agreement as one in which "[t]he ship is then directed by [the charterer] and manned by his crew; it makes his voyages and carries the cargo he chooses. Services performed on board the ship are primarily for his benefit." Id. at 412. Payment under a bareboat charter agreement is generally made periodically but without regard to whether the charterer uses the vessel or not. See Walker v. Braus, 995 F.2d 77 (5th Cir. 1993); Limonium Maritime, S.A. v. Mizushima Marinera, S.A., 961 F. Supp. 600 (S.D.N.Y. 1997) (charter agreement was for a twelve year period with semi-annual payments).

The charter agreement between HLT and HLC does not establish that HLT completely and exclusively relinquished control of the Tug. The intent behind the charter, as testified to by

both Haney and Hough, was not to transfer exclusive control to HLC, but to address an issue of accounting between affiliates. In addition, the charter agreement states that payment will be made on an hourly basis, portal to portal, when the Tug is in use. This provision of the agreement shows that HLT had not fully relinquished control to HLC because it was charging it by the hour.

Moreover, the conduct of the parties does not establish that HLC became the *pro hac vice* owner of the charter. HLT paid for almost $40,000 worth of repairs on the vessel. It continued to maintain insurance on the vessel. The Tug was docked at HLT's berth. These facts also make it clear that HLT had not entirely ceded control of the vessel to HLC.

The facts HLT highlights to argue that it transferred control of the Tug are not persuasive. HLT emphasizes the number of employees HLC had, the size of the projects HLC was working on, and states that HLC did not return the Tug to HLT at the end of the day. These factors do not demonstrate that HLT had ceded all possession and control to HLT. Simply because HLC had more resources and more employees does not show it had more control.

HLT's argument is largely based upon the Second Circuit's decision in <u>Karvelis v. Constellation Lines S.A.</u>, 806 F.2d 49 (2d Cir. 1986). There, the injured plaintiff asserted both unseaworthiness and Jones Act claims against the ship owner and charterer. Significantly, and unlike the instant case, the ship owner and charterer were represented by the same lawyer. Because of this, the ship owner, named Entemar, although disputing unseaworthiness as a matter of fact, effectively conceded that if the jury found unseaworthiness, it would liable for it. Entemar did not argue that the charterer, Constellation, should be liable for unseaworthiness as an owner *pro hac vice*; both Entermar and Constellation argued that Constellation was not an owner *pro hac vice*.

5

The Second Circuit affirmed the jury verdict in favor of plaintiff against Entemar on the unseaworthiness claim and Constellation on both the Jones Act and unseaworthiness claim. A majority of the panel majority held, as to the unseaworthiness claim against Constellation, that

> though Entemar was the record owner with title to the vessel, Constellation was much more than a mere time or voyage charterer. The district court held that Constellation also operated and managed the vessel at the time Karvelis sustained his injury. As operator, manager, and charterer, Constellation had such control and possession of the vessel as to be its owner pro hac vice. Hence, Constellation could properly be held liable on the unseaworthiness count.

Id. at 52 (citations omitted). The entire panel also found that there was sufficient evidence of negligence to support the jury's verdict as to the Jones Act claim against Constellation.

As both HLT and HLC have acknowledged on this motion, Karvelis is a peculiar case. First, there was a unity of interest between the owner and charterer, as reflected in their representation by the same lawyer. Perhaps for that reason, it is the only reported decision in which both the owner and the charterer were held liable for unseaworthiness. This is contrary to the basic purpose of the rule recognizing liability for unseaworthiness of an owner *pro hac vice*, which is to allocate that liability to the party best in a position to maintain seaworthiness. See Stephenson v. Star-Kist Caribe, Inc., 598 F.2d 676 (1st Cir. 1979). It is essentially an equitable rule relieving the owner of a liability which, as a result of its contractual arrangement, the owner could not control. Placing liability for unseaworthiness on an owner while simultaneously placing it on an owner *pro hac vice* does not serve the rationale for creating *pro hac vice* liability in the first place. None of the cases suggest the existence of joint and several liability, which was the effective result of Karvelis.

How did this happen in Karvelis? The explanation can be deduced from the concurring opinion of Judge Mahoney, in which he agreed with the panel as to Constellation's Jones Act liability, but disagreed that Constellation should have been held liable for unseaworthiness as an

6

owner *pro hac vice*. Perhaps it was the same unity of interest between the ship owner and the charterer in Karvelis that led to what seems to me, and seemed to Judge Mahoney, an erroneous jury instruction – "that '*every* shipowner or operator' is liable for unseaworthiness." Id. at 55 (Mahoney, C.J., concurring in the result) (emphasis added). As Judge Mahoney noted, this "is a standard which goes well beyond the rule established by" the Supreme Court decisions in Reed and Fitzgerald for imposing *pro hac vice* liability. Id. Judge Mahoney also pointed out that the jury instructions did not include any language setting forth the standard by which *pro hac vice* liability could be found. And yet, it does not appear from the majority or concurring opinion that the inadequacy of the jury instructions on this issue (there was an objection on an unrelated issue) was ever raised at trial or on appeal.

Because there was no controversy between the owner and charterer in Karvelis as to which entity between the two of them was responsible for a claim of unseaworthiness, and the unchallenged jury instructions did not explain that only one of them could be liable for that claim, I believe that Karvelis should be limited to its facts. The case did not directly address the issue present in this case, namely, whether the owner *or* the charterer, as opposed to the owner *and* the charterer, could be liable for unseaworthiness.

In the instant case, the real controversy as to who is responsible for the unseaworthiness claim is not between plaintiff and defendants, but, rather, between HLT and HLC. Plaintiff's counsel made this clear at the premotion conference, in which he acknowledged that so long as either defendant is held liable for unseaworthiness, then, at least coupled with plaintiff's Jones Act claim against HLC, plaintiff was not concerned with the result of this motion.[1]

---

[1] Plaintiff has filed opposition to HLC's motion, but it is understandably ambiguous as to how plaintiff wants this motion resolved. Plaintiff's main argument is that there are issues of fact as to whether HLC is the owner *pro hac vice*, although plaintiff does not explain what they are. In any event, I do not see any. There is no dispute about the

7

In sum, given the very different posture of this case as compared to <u>Karvelis</u>, I do not believe that <u>Karvelis</u> determines the result here. For the reasons set forth above, the facts are insufficient to establish that HLC is an owner *pro hac vice*.

## CONCLUSION

Defendant HLC's motion for partial summary judgment is granted and the unseaworthiness claim against HLC is dismissed.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
February 16, 2016

---

parties' conduct or the terms of the charter agreement. The only open issue is whether these undisputed facts are adequate to establish the legal conclusion of *pro hac vice* liability.

Indeed, the premotion conference demonstrated that even HLT and HLC are not particularly concerned with which of them bears this liability. As noted above, they are affiliated entities with ownership that is substantially if not completely overlapping, so the economic impact on their respective shareholders will apparently be the same. Rather, what appears to be driving this motion is that HLT and HLC have separate insurance policies that would cover the unseaworthiness claim, and thus the present motion is really a contest between their respective insurance carriers.